## A05A0031. CUTTER v. THE STATE.
### (617 SE2d 588)

PHIPPS, Judge.

Bronsilaw Cutter was charged with cocaine trafficking and marijuana possession. He filed a motion to suppress evidence of the drugs. After a hearing, the suppression motion was denied and his case proceeded to a bench trial. At the close of the evidence, Cutter renewed his suppression motion based upon the additional evidence adduced at trial. The trial court again denied the motion and found Cutter guilty as charged. Cutter appeals, contending that evidence of the drugs should have been suppressed. Because he has failed to present any meritorious argument that the trial court erred and we find a substantial basis for the court's ruling, we affirm.

> When reviewing a trial court's decision on a motion to suppress, this court's responsibility is to ensure that there was a substantial basis for the decision. The evidence is construed most favorably to uphold the findings and judgment, and the trial court's findings on disputed facts and credibility are adopted unless they are clearly erroneous. Further, since the trial court sits as the trier of fact, its findings are analogous to a jury verdict and will not be disturbed if there is any evidence to support them.[1]

The following evidence was adduced through the state's witnesses at the motion hearing and/or at the trial;[2] Cutter presented no witnesses. Corporal John Ricciardi of the Savannah Police Department testified that at about 10:45 p.m. on September 28, 2002, he and about ten to fifteen other law enforcement officers were "checking known drug areas" in response to complaints from citizens about drug

---

[1] *Lambright v. State*, 226 Ga. App. 424-425 (487 SE2d 59) (1997) (citations and punctuation omitted).

[2] "In determining the legality of a search, this Court can consider all evidence of record, including that found in pretrial, trial and post-trial proceedings." *Fritzius v. State*, 225 Ga. App. 642, 645 (484 SE2d 743) (1997) (citations omitted).

activity. The officers, traveling in a convoy of about five to ten marked and unmarked cars, stopped to investigate a certain street corner of a housing project. The officers exited their vehicles wearing what Ricciardi described as "raid gear": black pants, black shirts, and vests announcing "Police." Each officer was armed.

The officers approached four men who were standing at that street corner, identified themselves as narcotics agents, and began interviewing the men. While background checks were being conducted on the men, Ricciardi spotted an individual, later identified as Cutter, sitting alone in the front passenger seat of a car in the housing project's parking lot, about ten feet away from where the four men were being interviewed. Cutter immediately ducked down, which made Ricciardi suspicious that he was attempting to steal the car. Ricciardi therefore approached the passenger side of the car. Another law enforcement officer, Harry Glenn, accompanied Ricciardi and stood at the driver side of the car.

Ricciardi testified that Cutter "sat up, real scared and paranoid." Ricciardi asked Cutter politely for his identification. Ricciardi testified that Cutter said nothing, provided no identification, rolled up the windows, locked the doors, and then "just froze up."

Ricciardi testified that he shined his flashlight into the car, but saw no evidence of thievery such as damage to the steering column or to the dashboard. The keys were in the ignition, and an investigation of the car tag did not show that the car had been stolen. Ricciardi testified that he no longer suspected that Cutter was attempting to steal the car and that it appeared to him that Cutter was waiting for someone to return to the car. But he remained suspicious of Cutter because Cutter "looked like a statue, he was so scared."

Ricciardi advised Cutter that he was free to go. He asked Cutter repeatedly whether he was okay, to provide his identification, and to open the car door. Ricciardi testified that at no time did he touch the car door. Cutter did not attempt to leave and did not comply with Ricciardi's requests. Nor did Cutter comply with Glenn's subsequent requests for his identification. Within Cutter's hearing, Glenn next called a K-9 Unit so that a dog with narcotics training could sniff the air around the car. Describing the scene, Ricciardi testified, "[Cutter's] waiting in the car, so we could wait, too. So, we just waited for K-9 to come." Describing Cutter, Ricciardi testified, "[He] just maintained the same pose, just remained froze up."

Another law enforcement officer, Winston Maxey, decided to intervene. He had heard Ricciardi ask Cutter repeatedly, without success, to get out of the car and talk to him. In addition, he had heard Ricciardi and Glenn ask Cutter several times, without success, for his identification. Maxey went to the car and asked Cutter for his identification. Cutter only stared at him. Maxey eventually told

Cutter that "we can clear this whole matter up" if he would hand him his identification. In court, Maxey testified that the matter that they were trying to "clear up" was whether "[Cutter] was wanted for anything, the reason why he was trying to hide in the vehicle to begin with. Usually, when somebody hides they're hiding something else other than just their person."

Maxey testified that Cutter then lowered a window about an inch and slid a cardholder to him through the opening. Holding the cardholder, Maxey could feel a rock-type substance that felt to him like crack cocaine. As Maxey pulled out Cutter's identification, the officer saw the hard substance underneath the identification and handed it to Ricciardi. Based on its appearance, Ricciardi believed the substance to be hashish. The substance field tested positive for tetrahydrocannabinol.

Ricciardi then advised Cutter that he was being arrested based on possession of a controlled substance. Cutter exited the car, at which point Ricciardi conducted a patdown search incident to arrest and found in Cutter's pocket what was later confirmed to be approximately 127 grams of a mixture with a purity of 54.2 percent of cocaine.

Maxey testified that approximately ten or fifteen minutes had passed from the time Ricciardi and Glenn walked to Cutter's car until he obtained Cutter's identification. He testified that the drug dog arrived about ten or fifteen minutes after that. The record indicates that Cutter complied with Maxey's request about the time the K-9 unit arrived and that the drug dog alerted on the car after the field test of the suspected hashish, but before Cutter had exited the car.

Seeking suppression of the drug evidence, Cutter argued that his encounter with the law enforcement officers had evolved into a seizure that was unsupported by reasonable suspicion and that the unlawful seizure coerced him into handing the police his cardholder wherein contraband was found. In denying Cutter's motion to suppress, the trial court ruled that Cutter had not yet been seized when he handed Maxey his cardholder.

1. Cutter contends that the trial court erred in determining that he had not been seized by the time he complied with Maxey's request to produce his identification.

> There are three tiers of police-citizen encounters: (1) communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, (2) brief seizures that must be supported by reasonable suspicion, and (3) full-scale arrests that must be supported by probable cause. In the first level, police officers may approach citizens, ask for identification, and freely question the citizen without any basis or belief

that the citizen is involved in criminal activity, as long as the officers do not detain the citizen or create the impression that the citizen may not leave. The second tier occurs when the officer actually conducts a brief investigative *Terry* stop of the citizen. In this level, a police officer, even in the absence of probable cause, may stop persons and detain them briefly, when the officer has a particularized and objective basis for suspecting the persons are involved in criminal activity.[3]

In determining whether a police-citizen encounter constituted a seizure, a court must answer whether, considering all the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.[4]

Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.[5]

Maintaining that he was seized, Cutter asserts the following circumstances: the car in which he was sitting "was blocked in on all sides by either a building, other vehicles or other law enforcement officers which prevented him from leaving the area" and he "was further surrounded by a large number of law enforcement officers who were displaying raid vest[s] and weapons, and at least ten police vehicles some with their emergency equipment activated."

Cutter has not provided record citations for these assertions.[6] Ricciardi testified, "Not everybody was surrounding the car. The car wasn't blocked — The car was not blocked in at any time." Maxey confirmed that Cutter's car was not blocked and that the officers were

---

[3] *McClain v. State*, 226 Ga. App. 714, 716 (1) (487 SE2d 471) (1997) (citations and punctuation omitted).

[4] Id.

[5] *Aranda v. State*, 226 Ga. App. 157, 158 (1) (486 SE2d 379) (1997) (citation and punctuation omitted).

[6] See Court of Appeals Rule 25 (a) (1).

not "surrounding" it, although they were "in the area." Cutter has not specified which "emergency equipment" he complains of, but the record shows that only one officer had activated the flashing blue lights on his marked vehicle to alert the traffic in the area where the convoy had been temporarily stationed. Ricciardi testified, however, that "the cars that were in our convoy were down the street from that intersection" and that the car with the blue lights was approximately 50 feet from Cutter. A marked police car with its blue light activated, which was parked about 50 feet away from the scene as part of a car convoy down the street, does not compel a finding that Cutter had been seized.

Moreover, there was no evidence that Cutter made any attempt to leave or that the officers physically prevented him from doing so. The undisputed evidence is that Cutter was told that he was free to leave. The trial court specifically found that "[n]o sanctions or threats were made against defendant" based on his initial refusal to produce identification. This finding was supported by some evidence. Ricciardi was asked in court whether he had commanded Cutter to hand over his identification. Ricciardi answered, "No, I just asked him would it be all right if I see his identification, just wanted to validate what he was doing there, and he was free to go at any time." And Maxey confirmed that neither Ricciardi nor Glenn conveyed any impression that their requests constituted commands or that failure to comply with them would result in some adverse consequence. In addition, Maxey testified that no officer drew a weapon. Because there was evidence to support the trial court's finding that no officer threatened Cutter, we adopt that finding.[7]

The trial court remarked that Cutter may have been motivated by the summoning of the K-9 unit, but ultimately found that he had not been detained pending that unit's arrival.[8] This finding was supported by some evidence. Ricciardi testified that even before the officers approached the car, Cutter was already sitting in it, apparently waiting for someone. And as already noted, there was no evidence that Cutter was thereafter threatened or physically restrained from leaving. Because there was evidence to support the

---

[7] See *Lambright*, supra.

[8] See *McCray v. State*, 268 Ga. App. 84, 87-88 (2) (601 SE2d 452) (2004) (where car occupant is not detained illegally, a dog handler may walk a dog around the car because the use of a trained drug detection dog, in a location where he is entitled to be, to sniff the exterior of the car, is not an unreasonable search); compare *State v. Thompson*, 256 Ga. App. 188 (569 SE2d 254) (2002) (following warning citation for traffic offense, officer was not permitted to detain defendant pending arrival of drug dog, based on defendant's nervousness and odor of detergent believed to be masking odor of marijuana).

trial court's finding that Cutter was not detained by the officers pending arrival of the K-9 unit, we adopt that finding also.[9]

Cutter has failed to demonstrate that the trial court erred in determining that he had not been seized by the time he complied with Maxey's request to produce his identification. Having construed the evidence most favorably to uphold the trial court's findings and judgment, as we must, we find that Cutter was not physically restrained from leaving the scene; that the officers did not detain him at the scene before the discovery of the contraband; and that there was no threatening presence of several officers, display of a weapon by any officer, physical touching of his person by an officer, use of language or tone of voice that would have indicated that compliance with the officers' requests was required, or any other such evidence that would compel a finding that a seizure had occurred.[10] Accordingly, we find a substantial basis for the trial court's denial of Cutter's motion to suppress evidence.

2. Cutter contends that the trial court erred in determining that he had not been seized, asserting that the officers "were not authorized to continue to request his identification since they were able to determine that he had not committed any criminal offense after their initial investigation."

Even when law enforcement officers have no basis for suspecting that a particular individual has committed a crime, they may generally ask questions of that individual, including asking to examine his or her identification.[11] What governs here is not whether the officers asked questions and made requests of Cutter without having reasonable articulable suspicion, but whether the circumstances surrounding the encounter would have conveyed to a reasonable person that he was not free to decline the officer's requests or otherwise terminate the encounter.[12] As we have determined that Cutter failed to make this requisite showing,[13] this contention is without merit.

3. Cutter contends that the trial court erred in refusing to suppress the evidence of the drugs, claiming that he handed Maxey his cardholder for the purpose of retrieving his identification only and that the officer's "enter[ing] the identification case to determine the hard object created a second-tier encounter, which required articulable suspicion which [he] did not possess."

---

[9] See *Lambright,* supra.

[10] See *Akins v. State,* 266 Ga. App. 214 (596 SE2d 719) (2004); *State v. Folk,* 238 Ga. App. 206 (521 SE2d 194) (1999); *Aranda,* supra.

[11] *Aranda,* supra at 158-159.

[12] Id.

[13] See Division 1, supra.

The evidence shows that Cutter voluntarily passed his cardholder to Maxey so that the officer could retrieve from it his identification.[14] Holding the cardholder, Maxey felt a hard substance, which he believed was crack cocaine. The officer removed the identification, exposing the contraband. "Contraband lawfully found in plain view need not be ignored and can be seized."[15] The contraband was found in plain view. The officer was lawfully in a position to obtain the view of the substance.[16] Thus, there is no merit to Cutter's claim that the officer's reaching into his cardholder constituted a seizure.

*Judgment affirmed. Andrews, P. J., and Mikell, J., concur.*

DECIDED JULY 8, 2005 —
RECONSIDERATION DISMISSED JULY 27, 2005.

*Stephen R. Yekel*, for appellant.
Bronsilaw Cutter, *pro se.*
*Spencer Lawton, Jr., District Attorney, George R. Asinc, Assistant District Attorney*, for appellee.

---

[14] See Division 1, supra.
[15] *McCollum v. State*, 257 Ga. App. 330, 333 (2) (a) (571 SE2d 405) (2002) (footnote omitted).
[16] Id.